## WAITSHOAIR *et al. v.* THE CRAIGEND.

*(District Court, D. Washington, W. D.   April 28, 1890.)*

1. SEAMEN—CONTRACT—CONSTRUCTION.
   Upon a review of the testimony in this case, the court finds that the libelants entered into a contract to serve as seamen on board the British ship Craigend for a definite period, during which time the vessel was to make one or more voyages within specified limits, and to a port of discharge in Europe; and pursuant to said contract they served as seamen on the vessel until their arrival at Tacoma, when, before the expiration of the term of service, the libelants voluntarily left the vessel, and the contract was terminated by mutual consent of the libelants and the master.

2. SAME—DISCHARGE—MUTUAL CONSENT.
   A contract of shipment, after part performance, may be lawfully abrogated as to the unperformed part by mutual consent of the seamen and master, and such consent may be implied from the conduct and actions of the parties.

3. SAME—WAGES.
   If a seaman's contract of service be terminated by mutual consent after part performance, a court of admiralty will neither decree payment of extra wages or damages as in case of a wrongful discharge, nor forfeiture of the wages earned by services rendered pursuant to the contract, as in case of desertion, but will allow wages at the rate fixed by the contract for the time of actual service.

*(Syllabus by the Court.)*

In Admiralty.

*Taylor & Hammond,* for libelants.

*Effinger & Abbott,* for claimant.

HANFORD, J.   The libelants, fifteen in number, set forth and show in their libel that they severally signed shipping articles by which they agreed to serve, some as able seamen, and the others as ordinary seamen, in the British ship Craigend, for a period not to exceed two years, and during that period to make one or more voyages within specified limits, the service to end at any port or place in the United Kingdom or the continent of Europe, at the master's option, for which they were to receive wages at a fixed rate per month.   This is an entire contract, and I consider it to be valid, notwithstanding the objections urged by counsel for the libelants on account of indefiniteness in description of the voyages to be made during the term of service.   Under this contract, some of the libelants served as seamen on the passage of the Craigend from Cardiff to Montevideo, where the others were shipped; and they all so served on the passage from the latter place to Tacoma, at which they all left the vessel.   The suit is brought to recover wages, at the rate specified in the shipping articles, for the time each man actually served, after deducting advances and payments admitted to have been received; and also three months' extra wages as damages for breach of the contract on the part of the master, in wrongfully preventing the libelants, as they allege, from returning, after a temporary and lawful absence from the vessel at Tacoma, and completing performance of their contract.   The answer denies the alleged wrongful acts of the master, and charges the libelants with having unjustifiably deserted the vessel, for which a forfeiture of all wages is claimed.

From the evidence, it is plainly apparent to me that the master and the libelants are about equally in fault and blameworthy for the termination of this contract. The important facts leading me to this conclusion, as disclosed in the evidence, are, in brief, as follows: The Craigend, on her way to Tacoma, called and anchored at Port Townsend; and while she was at anchor there the second boatswain became violent and abusive towards the crew. After making a violent and unprovoked assault upon one man, and striking him a heavy blow upon the head with a stick of cord-wood, and making threatening demonstrations towards another with a razor, and striking another with a broken oar, he armed himself with a hatchet, and threatened to use it indiscriminately in cutting down every member of the crew whom he should come in reach of. This misconduct of the second boatswain was by the libelants properly reported to the master, who utterly failed to do his duty by punishing this petty officer for his very grave offense, or in any way assuring the crew of protection from such acts of abuse. The libelants at the same time committed a wrong in declaring that they would not thereafter do any work in the ship, except what should be necessary in actual navigation, unless the second boatswain should be either kept locked up, if he remained on board, or discharged and sent ashore. There is a conflict in the testimony as to whether the libelants did or did not at this time ask permission to go ashore for the purpose of complaining to the British consul, and whether the master did or did not refuse them such permission. This conflict of testimony relates to a question which is material only as to the claim of libelants to extra wages. They make the charge, and therefore the *onus probandi* is on them to prove it; and, as I do not find any decided preponderance of the evidence in their favor, I cannot say as a fact that the master did violate his contract with them, and offend against the laws of his country, by refusing them an interview with the British consul at Port Townsend.

After anchoring at Tacoma the libelants refused to perform their duties until they should first be permitted to make a complaint to the British consul; and, upon being informed that there was no consul at Tacoma, they demanded to go ashore for the purpose of consulting a justice of the peace. It was unnecessary and unreasonable for them to leave the ship in a body; but the master gave his consent to their going after they, at his request, hung an anchor over the bow, in readiness to be dropped if the ship's safety should require it. The master not only consented to their leaving the vessel, but he also gave them forty-eight hours as the limit of time during which they could remain absent; and by his direction they were taken ashore in a boat belonging to the ship. He gave them no money for any expenses they might have to incur, and made no arrangements whatever to enable them to return to the ship, which was anchored a distance of three-fourths of a mile from shore. On shore the men made no attempt to execute their purpose of consulting a justice of the peace; but, after wandering over the town for some time, they begged a postage-stamp, having no money to buy one, and used it to send a letter to the British consul at Port Townsend. They next made

the acquaintance of Mr. Moore, who provided them with their meals and lodging for the next day or two, and with small sums of spending money, and also provided a boat and secured a lawyer to go on board the vessel the evening of the very day the libelants came ashore for the purpose of trying to make a settlement with the master for the wages. What Mr. Moore did for the comfort of these men was not done from disinterested motives. To use his own expression, he "was not doing it for fun." It is apparent from his rapid movements in taking a lawyer on board the vessel to collect the wages, and all the circumstances of his connection with this case, that he is one of the land-sharks of a seaport town who prey upon sailors. Mr. Moore has testified as a witness in the case, being called by claimant. In his testimony, he claims that the libelants consulted with the lawyer before he went to the vessel, and authorized him to proceed to collect their wages. In this he is contradicted by the libelants, and also by the lawyer, Mr. Leo, who was called as a witness. His testimony is to the effect that he had no conversation with the men, but he thinks they knew of his employment, and the object of it, from being informed in regard to it by Mr. Moore. He impressed me as being a candid witness, and I credit his statement as being true; but I think very little time was lost in consulting with the libelants, or making explanations to them, by any one. In the interview between Mr. Leo and the master, the latter, after learning that the call upon him was to collect the wages of the libelants, and while he must have supposed Leo to be authorized to represent them, declared that he would not again receive them on the vessel. This was long before their leave of absence had expired, and before the men had done anything to furnish a pretext for a charge of desertion against them, or justify their discharge. I regard this declaration of the master to Leo, that he would not take the men back in the ship, as important only as showing an intent in the mind of the master to get rid of this crew. I would probably regard it as an actual discharge of the men from the service of the ship if it had been made to the men directly, or to one authorized to represent them; but, as the libelants all deny having commissioned Mr. Leo to go to the master as their agent or attorney, I cannot give it any greater effect than a remark or declaration made to any stranger.

It was mid-day, on a Saturday, when the men left the ship. On the next Monday morning, and before expiration of their leave of absence, they went as near as they could go to the ship, and attempted to hail her, to call a boat ashore, so they could go on board, and resume their duties; but Mr. Moore appeared and objected, on the ground that, if they went on board without him, he would not be able to collect their wages, and would lose what he had invested, as well as the profits he had hoped to realize, and the men suffered him to lead them away, and for a time desisted from their efforts to return to the ship. Later, and yet before the expiration of their 48 hours' leave of absence, they saw the captain come ashore, and endeavored to speak to him; and he saw them, and knew that they were endeavoring to get within speaking distance, but he evaded them by dodging into a private office, and re-

maining there a long time, while he knew that they were respectfully waiting outside. The libelants did not return to the vessel, and have never made any other attempt to do so than what I have mentioned. Several days after their attempt to speak to the captain, they sent a man to him to request permission to remove their clothing and effects from the vessel, which request was readily and unconditionally granted; and they then voluntarily went on board and brought away all their belongings. This was done while the vessel was lying moored to the dock, and while the master was on deck, but no remarks were passed between him and the men. The master, in his testimony, attempts to account for his peculiar conduct in eluding the libelants when they tried to speak to him on Monday morning, when their purpose was merely to ask to have the ship's boat to take them on board again, and also for his failure to speak to them when they came on board to remove their effects, by pretending that he was in fear of being ill-treated by these men. I was astounded to read in the deposition of the master of an English ship such a declaration as is contained in that of Capt. Hamilton, on file in this case, in which he says, "I was a bit scared," especially so as there is absolutely nothing in the evidence to afford the slightest ground for him at that time to have regarded these men, or either of them, as being dangerous. The reasons he states for his timidness are that he had heard of threats being made by the men, and that they had used violence towards a man whom he had employed as a watchman on the ship; but it is clear, from the evidence, that the threats, if any, were not made, and the difficulty with the watchman did not occur, until after the time of the captain's strange conduct. I entirely discredit this part of the captain's evidence. I do not believe that he was ever afraid of this crew. He has been master of vessels for fourteen years. This is sufficient to prove that he could not have been frightened so easily as he pretends to have been; for, without personal courage, he would not wish to devote his life to a profession exposing him to almost constant danger, and, if he would, he could not maintain the position of a commander. I believe that his motive for the actions I have commented on was not fear, but rather a wish to avoid meeting the men, and thus escape the necessity of either assisting them to return to the ship, or consenting to have them quit the service, and that it was his desire that they should desert, so that their wages might be forfeited. The master did not prevent the libelants from returning to the vessel, nor use any force whatever to prevent them from fulfilling their contract; and I am satisfied that if they had returned to the vessel, and offered to resume their stations as seamen, he would have placed no obstacles in their way. The libelants claim, however that, because they had no money to hire a boat, they were not able to return to the vessel, but the evidence shows that they have managed to live in Tacoma very well to the present time without doing any work; and I am satisfied that they are shrewd enough, and determined enough, to have found a way of returning to the vessel, if they wished to do so.

From consideration of all the facts and circumstances in the case, and especially the voluntary removal of their effects from the vessel by the

libelants, and the master's consent thereto, so freely given, it is plain that the contract of service on the part of the libelants was, by the mutual consent of the libelants and the master, terminated from the time the libelants left the vessel, on the 25th day of January, 1890. The parties had a right thus to terminate the contract by mutual consent; and, although such consent was not actually expressed in words, it may be implied from the conduct and actions of the parties above narrated. The contract having been partly performed, and then abrogated as to the part not performed by mutual consent, I hold that the libelants are not entitled to recover any sum whatever as damages or as extra wages, as they would be if the master had discharged them before the termination of the period or voyage for which they had shipped, but are entitled to receive their wages, at the rate specified in the shipping articles, for the time during which they actually served, after deducting the sums advanced, and for which they were chargeable for articles furnished from the ship's slop-chest. The master having voluntarily consented to their leaving the vessel, he cannot rightfully be allowed to charge them as deserters, nor claim a forfeiture of their wages earned by actual service. I make an exception as to Lawrence Silva, Antonio Pedro, and Antonio Fortes, as to the rate of wages to be allowed them, on the ground that they shipped at Montevideo as able seamen, but were incapable of performing the duties of able seamen. Therefore, instead of allowing them wages at the rate specified in their contract of shipping, they will only be allowed wages at the rate of $15 per month, which sum seems to me to be in proportion to the value of their services. A decree will be entered in favor of the libelants for the amount of wages during the time of their service as alleged in the libel, less the amounts which in the libel they admit as credits proper to be allowed the ship.